IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


LOUISIANA PACIFIC CORPORATION,   )
                              )
        Plaintiff,             )
                              )
v.                              )        Case No. 3:11-cv-00317
                              )        Judge Brown
THE TEAFORD CO., INC., et al.,      )
                              )        **Jury Demand**
        Defendants.         )


## MEMORANDUM

Presently pending before the Court is Defendant The Teaford Co.'s Motion for Summary Judgment. (Docket Entry 36). Defendant The Teaford Co. ("Teaford" or "Defendant") has also filed a Memorandum and an Evidentiary Submission. (Docket Entries 36, 37). Plaintiff has filed a Response to the Motion. (Docket Entries 42, 53).[1] Defendant has filed a Reply. (Docket Entry 43). In response to the Court's Order, Defendant filed a Statement of Undisputed Material Facts, and Plaintiff filed a Response. (Docket Entries 49, 54). For the reasons set forth below, Defendant's Motion is **GRANTED in part** and **DENIED in part**.

---

[1] These two docket entries appear to be identical. It is unclear why Plaintiff apparently filed its Response a second time.

## I. FACTS[2]

Defendant filed a statement of 48 undisputed material facts. (Docket Entry 49). Plaintiff

filed a response. (Docket Entry 54). The Court has summarized the undisputed facts below.

1.      On or about November 15, 2005, LP entered into a written contract with Teaford to

design, fabricate, supply, and install a heat source system for the LP Oriented Strand

Board ("OSB") facility in Clarke County, AL.

2.      Paragraph 18(z) of the contract contains the following Limitation of Liability provision:

> Limitation of Liability: Neither parties [SIC] remedies against the other
> party for breach of this Agreement nor any claims against a party arising
> out of the performance of this Agreement, whether in tort, negligence,
> contract, strict liability or pursuant to the statute, shall exceed damages in
> the maximum amount of twenty-five percent (25%) of the Contract Price.
> EACH PARTY WAIVES ALL RIGHTS TO CLAIM
> CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN ANY WAY
> RELATING TO THIS AGREEMENT OR THE WORK, INCLUDING
> WITHOUT LIMITATION THE COSTS OF LOST FINANCING, LOST
> PROFITS AND DAMAGED BUSINESS REPUTATION AND
> INCLUDING DAMAGE CAUSED BY TERMINATION OF THIS
> AGREEMENT; EACH PARTY WAIVES ALL CLAIMS TO PUNITIVE
> DAMAGES AGAINST THE OTHER FOR ANY REASON OR CAUSE
> WHATSOEVER.

3.      The contract price found in Paragraph 6(a) was $9,356,200.00.

---

[2] With its response, Plaintiff also filed eight (8) "Additional Undisputed Facts," to which
Defendant failed to reply. The Court has disregarded these facts, however, because
Local Rule 56.01(c) allows the non-moving party to file "a concise statement of any
additional facts that the non-movant contends are *material* and as to which the non-
movant contends there exists a genuine issue to be tried." Local Rule 56.01(c)
(emphasis added).

4.     After the contract was entered into between LP and Teaford on November 15, 2005, LP

       arranged for insurance for the construction fo the Clarke County OSB facility under an

       Owner Controlled Insurance Program ("OCIP").

5.     LP required Teaford to participate in the OCIP. This was not a voluntary insurance

       program.

6.     Teaford participated in the OCIP program and was an enrolled contractor as of October 1,

       2006. At the time of the explosion, construction was complete.

7.     The insurance premium charges for Teaford's participation in the OCIP were deducted

       from Teaford's contract price with LP.

8.     The Teaford employees performed work at the construction site.

9.     The OCIP was governed by a written OCIP manual dated March 20, 2007. The OCIP

       policy manual contains the following waiver of subrogation rights provision:

> Waiver of Subrogation Rights: Except for the amount of the deductibles as
> stated elsewhere in this contract, the enrolled parties each on their own
> behalf and on behalf of anyone claiming by, through or under them,
> whether by way of subrogation or otherwise, hereby waive any and all
> subrogation rights which they may now or hereafter have against each
> other and the parent, related and affiliated companies, the successors and
> assigns of each other, in connection with the performance of the Work to
> the extent such subrogation rights are not the result of any intentional
> wrongful act or omission of the party causing such loss and are covered
> losses under the insurance provided hereunder.

10.    The fire involved in this lawsuit occurred on May 7, 2008, in the Primary Thermal Oil

       Room of LP's OSB facility located in Thomasville, Alabama.

11.    This was a brand new facility for LP. The first OSB was manufactured on March 20,

       2008, approximately seven weeks before the fire.

Defendant has included the following additional undisputed material facts. Plaintiff has admitted the general substance of these statements for purposes of this Motion but believes these facts are unnecessary to resolve the Motion. Because these facts describe the events underlying the lawsuit, the Court includes them below, in narrative form. The Court agrees with Plaintiff, however, that only the undisputed facts listed above are necessary to decide Defendant's Motion.

On the evening of May 6, 2008, around 9:25 p.m., LP operators Wade Jackson and Kevin Dennison experienced a problem at the mill. Specifically, the damper inside the Induction Draft Fan ("ID Fan") for the primary thermal oil was closed which caused the temperature of the thermal oil to decrease. Jackson told Dennison that he could not get the damper to open automatically. This was not the first time the damper had failed to open automatically. It had happened a week or so earlier on a different shift.

According to Paul Leger of LP, LP had worked on the problem, but he did not know what was done or who did the work. Scott Grant of LP and Leger met at the ID Fan. Grant reminded Leger that there had been a prior problem with an electrical panel (PLC04) and suggested that he recheck that panel. Leger went to PLC04 with Grant and another LP employee, Alan Bishop, and initially found nothing wrong. Grant then told Leger not to worry about it because they had opened the damper manually, the thermal oil temperature was coming up, and LP would work on the problem the next day during a scheduled shut down.

A little while later, Grant asked Leger to troubleshoot the problem with the damper again to give the LP maintenance department a head start the next morning. When Leger and Bishop went back to PLC04 the second time, Leger thought he discovered the problem. Leger did not see a green LED display light burning on one of the power supplies in PLC04. After checking

the power supply with a Fluke meter, he concluded the power supply was defective because the power supply was receiving input but producing no output.

Leger then reported his findings to supervisor Grant who asked Leger if he could correct the problem. Leger told Grant that they could replace the power supply. Leger then told Grant that he would remove the power supply and meet him at the supply room to find a replacement. Leger tripped the breaker to the power supply which killed the power to the power supply and then removed it. Unfortunately, after looking for over an hour, he and Grant were unable to locate a replacement power supply.

When Leger turned off the power to the power supply, it disabled 21 devices associated with PLC04. It also froze the thermal oil temperature reading being displayed on Jackson's computer screen at its last recorded reading which was 457 degrees Fahrenheit. This was below the set point of 460 degrees.

It is undisputed that all of the modules associated with PLC04, with the sole exception of the ID Fan damper, were functioning correctly before Leger removed the power to the subject power supply. Unfortunately, no one told the LP operators in the control room that the damper was manually left open or the power supply from PLC04 had been removed.

According to LP's post-accident investigation, the ID Fan damper was manually opened by LP employees to 100% around 10:15 p.m. on May 6, 2008, and remained fully open until the explosion occurred on May 7, 2008 at approximately 1:52 a.m.

Andy Dean of LP was the project engineer for the LP Clarke County plant. In addition, he assisted in the construction management of the facility.

Greg Letarte is employed by LP as an Engineering Manager.

David Crowe is the Vice President of Engineering for LP and was the former Director of Manufacturing for LP's 13 OSB plants, including the plant in Clarke County, Alabama. According to Crowe, the Fill and Drain Tank in the Primary Thermal Oil Room became overfilled with superheated thermal oil and some of the superheated oil and vapors from it entered the Primary Thermal Oil Room from the subject tank.

LP had suffered fires from Fill and Drain Tank vent pipes at its OSB plants in Two Harbors, MN and Silsbee, TX, prior to the explosion involved in this lawsuit. Crowe investigated these incidents after the Clarke County explosion.

LP was going to vent the Fill and Drain Tank outside the Primary Thermal Oil Room on the day of the subject explosion pursuant to a scheduled shut down.

## II.  LEGAL DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate if there is "no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The main inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  After sufficient time for discovery and upon motion, Fed. R. Civ. P. 56(c) mandates summary judgment against a party who fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

When deciding a motion for summary judgment, the court must review the evidence and draw all reasonable inferences in favor of the non-moving party. *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006). In order to survive summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e). Thus, even if the nonmovant produces some evidence, the production will not be sufficient to defeat summary judgment so long as no reasonable jury could reach a finding on that issue in favor of the non-moving party. *Anderson*, 477 U.S. at 248. In other words, the nonmovant must produce supporting factual evidence that is not "so conclusively contradicted by the record that no reasonable jury could believe it." *Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009). The mere existence of a scintilla of evidence in support of the nonmoving party's position will be insufficient to survive summary judgment rather, there must be evidence on which the jury could reasonable find for the nonmoving party. *Anderson*, 477 at 252.

## B. Analysis

1. LP's requirement that Teaford participate in an OCIP containing a waiver of subrogation provision does not constitute a waiver.

   Defendant has filed the OCIP policy manual ("OCIP Manual") as an exhibit to their Motion (Docket Entry 37-2 or 50-2).[3] The OCIP Manual notes that participation is mandatory, and the insurance "will terminate on the date the Project has been accepted by LP as complete, except for the extended completed operations coverage." (Docket Entry 50-2, p. 10). The OCIP Manual also indicates that the following insurance coverages are provided by the OCIP:

---

[3] It is worth noting that the OCIP Manual explicitly does not provide "complete information about coverage" or "answers to specific claim questions." (Docket Entry 50-2, p. 7).

workers' compensation insurance, commercial general liability insurance (excluding

professional liability), excess liability insurance, and builder's risk. (Docket Entry 50-2, pp. 10-

11). The OCIP Manual also contains a Waiver of Subrogation Rights provision, which states:

> Except for the amount of the deductibles as stated elsewhere in this
> contract, the enrolled parties each on their own behalf and on behalf of
> anyone claiming by, through or under them, whether by way of
> subrogation or otherwise, hereby waive any and all subrogation rights
> which they may now or hereafter have against each other and the parent,
> related and affiliated companies, the successors and assigns of each other,
> in connection with the performance of the Work to the extent such
> subrogation rights are not the result of any intentional wrongful act or
> omission of the party causing such loss and are covered losses under the
> insurance provided hereunder.

(Docket Entry 50-2, p. 12).

Defendant's central argument is that LP has waived its subrogation rights against

Defendant through this clause in the OCIP. Plaintiff, however, notes that this clause applies only

to "covered losses" under the OCIP and claims Defendant's conduct fell into three categories not

covered by the OCIP: work performed off site, work within the professional liability hazard, and

property damage occurring after construction was complete. (Docket Entry 50-2, pp. 10-12). As

an alternative, Defendant argues that LP has conceded their claims are limited to work performed

offsite and professional liability claims because the subrogation provision applies to everything

else.

As support for their central argument, that LP has waived its subrogation rights through

the OCIP clause, Defendant cites *Affiliated FM. Ins. Co. v. Patriot Fire Protection, Inc.*, 2004

WL 418102 (Was. App. Div. 1, March 8, 2004). While that court found an implied waiver of

subrogation rights under an OCIP, the Court believes it is distinguishable from the facts here.

The court noted that it was "undisputed the OCIP policies would have covered property damage of the type that occurred." *Id*. at *3. Because the OCIP at issue here contains an explicit waiver of subrogation that only applies to "covered losses," Defendant's reliance on this case is misplaced.

Here, the underlying issue is whether the OCIP would cover Plaintiff's losses. As noted above, the OCIP explicitly does not cover work performed off site, work within the professional liability hazard, and property damage occurring after LP accepted the project as complete. The extent to which Plaintiff's losses fall into one or more of these three categories is disputed, and, therefore, summary judgment is not appropriate based on this ground. The Court also rejects Defendant's argument that LP has conceded the subrogation provision applies to everything but claims based on work performed offsite and professional liability. Plaintiff also contends that the property damage occurred after LP accepted the project as complete. The Court does believe that losses that do not fall into the three categories identified above would be covered under the subrogation provision and waived.

2.      LP has contractually limited its claims for damages against Teaford to a maximum of 25% of the contract price.

Paragraph 18(z) of the contract between LP and Teaford (the "Contract") contains the following Limitation of Liability provision:

> Limitation of Liability: Neither parties [SIC] remedies against the other party for breach of this Agreement nor any claims against a party arising out of the performance of this Agreement, whether in tort, negligence, contract, strict liability or pursuant to statute, shall exceed damages in the maximum amount of twenty-five percent (25%) of the Contract Price. EACH PARTY WAIVES ALL RIGHTS TO CLAIM CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN ANY WAY RELATING TO THIS AGREEMENT OR THE WORK, INCLUDING WITHOUT LIMITATION THE COSTS OF LOST FINANCING, LOST

PROFITS AND DAMAGED BUSINESS REPUTATION AND INCLUDING DAMAGE CAUSED BY TERMINATION OF THIS AGREEMENT; EACH PARTY WAIVES ALL CLAIMS TO PUNITIVE DAMAGES AGAINST THE OTHER FOR ANY REASON OR CAUSE WHATSOEVER.

(Docket Entry 50-1). Defendant argues Plaintiff has contractually limited its liability to 25% of the Contract Price. Plaintiff argues that there is a question of fact as to whether Defendant materially breached the contract, rendering the limitation of liability unenforceable. Specifically, Plaintiff alleges Defendant failed to complete performance of the contract and thus materially breached the contract because Defendant's "controls of the thermal oil system were woefully deficient and did not comply with recognized standards from the NFPA." (Docket Entry 53, p. 17).[4]

Reading the Limitation of Liability provision, it is difficult to accept Plaintiff's argument that it should not apply to this case. The provision is clear that in an action for breach of contract or an action based in "tort, negligence, contract, strict liability or pursuant to statute," damages are limited to twenty-five percent (25%) of the contract price. Plaintiff's argument strains credulity on this point. Even if Defendant's alleged breach was material, Plaintiff cannot declare the entire contract null and void. *See* Restatement (Second) of Contracts, § 237 (describing the two possible effects of a material failure of performance on the other contract party). As Plaintiff

---

[4] Plaintiff also argues that enforcement of the Limitation of Liability provision would violate public policy. Plaintiff relies primarily on a Pennsylvania state case, *Warren City Lines, Inc. v. United Refining Co.*, 287 A.2d 149 (Pa. Super. 1971). In that case, however, the "applicability of the indemnity clause [was] not clear on its face," making summary judgment inappropriate. *Id.* at 154. In contrast, this Limitation of Liability is clearly applicable to any breach of the Contract. Plaintiff agreed to the Contract, which also requires Defendant to "comply . . . with all applicable federal, state and local laws, regulations and standards." (Docket Entry 50-1, pp. 17-18). If Defendant in fact breached the contract, Plaintiff has agreed to limit its own and Defendant's liability to a percentage of the contract price.

apparently drafted the agreement, there can be no question that it was aware of the Limitation of

Liability provision. Therefore, Defendant's Motion is **GRANTED** on this point, and Plaintiff's

liability is limited to twenty-five percent (25%) of the contract price, which is defined in the

contract as $9,356,200.00.

3.      The substantive law of the state of Tennessee will govern this litigation.

        The Contract (Docket Entry 50-1) contains a governing law provision:

> <u>Governing Law</u>: This agreement and all rights and obligations hereunder
> will in all respects be governed by and construed according to the laws of
> the state of Tennessee, excluding choice-of-law rules and excluding the
> United Nations Convention of Contracts for the International Sale of
> Goods, as amended. Exclusive jurisdiction and venue for the purposes of any
> litigation between or involving the parties whether arising under this Agreement
> or otherwise will be in the state and federal courts located in Davidson County,
> Tennessee, and each party hereto waives all claims that such a forum is
> inconvenient or that a more convenient forum can be found.

Defendant argues that Tennessee choice of law rules mandate that Alabama law should apply,

while Plaintiff argues that Tennessee choice of law rules support upholding the contract clause.

While Defendant does not indicate why the substantive law issue is important, Plaintiff indicates

in its Response that the Alabama comparative fault statutes are potentially more favorable to

Defendant.

        This contract provision is poorly worded. The first sentence, which designates Tennessee

law as the governing law of the contract, also explicitly (and curiously) excludes Tennessee's

choice of law rules. If we are to give any meaning at all to this contract provision, however, it

*must* mean that the substantive law of Tennessee applies to the subject matter of the contract.

Defendant's interpretation requires mental gymnastics that make little sense. The reader must

first look to Tennessee's choice of law rules (which explicitly do *not* apply under the terms of

11

the Contract), then must evaluate which laws would apply based on a set of laws explicitly excluded under the Contract. The simpler interpretation is that Tennessee law applies, period. Choice of law rules are excluded because, as here, they may require a different result other than the one intended by the parties. It is clear to the Court that the parties meant what they agreed to in the Contract, namely, that Tennessee law applies for the purposes of governing and construing the terms of the Contract.

III.  CONCLUSION

For the reasons set forth above, Defendant's Motion is **GRANTED in part** and **DENIED in part**. The Limitation of Liability applies to Plaintiff's claims, and damages are contractually limited to $2,339,050.00, or twenty-five percent (25%) of the Contract price.

ENTERED this 2nd day of August, 2012.

/S/ Joe B. Brown

Joe B. Brown
United States Magistrate Judge